IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | |
| | : | |
| SHANNON DRAKE | : | 1:16CR205-2 |
| RONALD KEITH EARNEST | : | 1:16CR205-3 |
| ROBERT TAYLOR | : | 1:16CR205-4 |

GOVERNMENT'S TRIAL BRIEF

The United States, through Matthew G.T. Martin, United States
Attorney for the Middle District of North Carolina, respectfully submits this
trial brief. The United States wishes to advise the Court of certain legal and
evidentiary issues that may arise during trial. The United States may
supplement this brief prior to trial.

I.    Status of the Case

Ronald Earnest ("Earnest"), Shannon Drake ("Drake"), and Robert
Taylor ("Taylor") are currently awaiting trial on charges contained in a multi-
count superseding indictment. All were formerly employed by a federally-
insured, South Carolina bank identified in the superseding indictment as "SC
Bank" – Earnest as the president, Drake as an assistant vice president account
manager, and Taylor as a vice president. Douglas Corriher, who formerly

served as vice president in the bank's factoring department and is identified as a co-conspirator in the superseding indictment, previously pleaded guilty to violating 18 U.S.C. § 371 (Klein-type conspiracy[1]). Similarly, in 2011 the individual identified in the superseding indictment as "BGH" was tried for and convicted of dozens of counts of payroll tax fraud in connection with the events described in the superseding indictment.

Count One of the superseding indictment alleges a multi-object conspiracy to defraud the United States by Earnest, Drake, and Taylor in violation of 18 U.S.C. § 371. Counts Two through Fourteen charge all three with bank fraud, in violation of 18 U.S.C. § 1344(2). Counts Sixteen through Twenty-Seven charge all three with misapplication of bank funds, in violation of 18 U.S.C. § 656. Count Twenty-Eight charges Earnest with a conspiracy to defraud the United States with respect to payroll taxes, in violation of 18 U.S.C. § 317 (Klein). Count Twenty-Nine charges Drake and Taylor with conspiracy to make false bank entries, in violation of 18 U.S.C. § 371. Count Thirty charges Earnest with obstruction of justice, in violation of 18 U.S.C. § 1503.

---

[1] United States v. Klein, 247 F.2d 908, 921 (2nd Cir. 1957). As discussed *infra*, a Klein conspiracy is simply a conspiracy to defraud the Internal Revenue Service (IRS).

The trial of the three co-defendants is scheduled to begin January 7, 2019. The government anticipates that it will take approximately three weeks to present its case-in-chief, and expects to call approximately 35 witnesses.

An exhibit list will be provided to the clerk of court prior to trial. The defense was supplied with preliminary exhibit lists and preliminary sets of trial exhibits in electronic form in April 2018 and again on November 7, 2018. An updated preliminary set of exhibits was delivered to the defendants on December 26, 2018. Drafts of summary charts have been provided to defense counsel and updated copies of such exhibits will be provided as they are completed. The United States reserves the right to supplement the exhibit list during trial.

II.     Theory of the Case

SC Bank is a federally-insured, state-chartered South Carolina bank. Earnest was the bank's president, Taylor was a vice president focusing on loan reviews, and Drake was an assistant vice president in the bank's factoring loan department. Drake also held the title of account manager.

Factoring Loans and BGH

During the time period relevant to the superseding indictment, SC Bank routinely extended what are known as factoring loans to various bank customers. Factoring is an arrangement in which a lender agrees to extend credit to a company using its accounts receivable as collateral.

3

Given that some customers pay their bills on time and others do not, factoring allows companies in need of stable cash flow to obtain the value of their accounts receivable (minus the lender's interest and fees) on a predictable, regular basis. So, for instance, if Company A has outstanding accounts receivable of $10,000 and needs that money immediately in order to pay overhead expenses, a factoring lender could provide $8,500 immediately and hold back the remaining 15% until those bills are eventually paid by the customers. Most factoring arrangements require that the customers make payments directly to the lender, rather than to the company that actually provided the services.

In factoring agreements, the lending bank or funding company normally requires that the borrower provide the lending bank with a first security position on its receivables to serve as collateral on the factoring agreement. Such a first security agreement allows the lending bank to attempt to recoup its losses if the borrower defaults on the factoring agreement.

SC Bank entered into written factoring agreements with its factoring customers. SC Bank did not provide factoring lines of credit as its normal business practice without a written factoring agreement between SC Bank and the factoring customer. The written factoring agreements typically identified specific collateral, including accounts receivable, to be provided to SC Bank to serve as security for any factoring advances under the factoring agreements.

4

SC Bank required that the factoring client provide the Bank with a first or senior lien position on the collateral, including accounts receivable. The Bank then filed UCC-1 forms with the relevant state's office of the Secretary of State, thereby giving notice of the Bank's first lien position.

It was also the standard practice of the Bank's factoring department to monitor the tax compliance of factoring clients of the Bank. Non-payment of taxes by a Bank factoring client put the Bank at increased risk of loss, as the government that is owed the taxes could claim a superior security interest in the assets of the factoring client, thereby allowing the government to be paid prior to the Bank by a factoring customer.

Staffing companies generally need regular access to cash in order to meet their large payrolls, and as such they are prime candidates for factoring loans. The individual identified in the superseding indictment as BGH owned a number of staffing companies, and he had previously been one of SC Bank's largest factoring borrowers. When SC Bank lost his business, it cut the bank's portfolio roughly in half. In 2008, the bank attempted to regain BGH's factoring business (now operating under the umbrella of Compensation Management, Inc. ("CMI")), but the amount of credit he needed far exceeded the limits that prohibited SC Bank from lending too much money to any one customer.

5

Significantly at that time, BGH also owed the bank about $1.3 million for bad factoring debt from the earlier period as well as delinquent personal loans. Earnest had been the loan officer with respect to those personal loans, and he needed to recover the lucrative business of factoring BGH's staffing companies in part to service BGH's non-performing personal loan account. Standing in the way of such aspirations, however, were the lending limits and the fact that CMI's assets, including its accounts receivable, were subject to liens for other creditors.

<u>Lending Limits</u>

South Carolina imposes on state-charted banks (such as SC Bank) limits on the amounts of loans that can be extended to any one borrower, and these limits are calculated as a percentage of the bank's capital. SC Bank also had its own lower, internal lending limits.

The lending limits discussed above serve to protect SC Bank, its depositors, and the deposit insurance system operated by the Federal Deposit Insurance Corporation (FDIC) from the risk associated with concentrating too much of the bank's capital in any one customer. In the case of SC Bank, these limits are overseen by both state (South Carolina Board of Financial Institutions (BOFI)) and federal (FDIC) bank regulators, whose examiners seek to identify lending relationships that should be aggregated for lending

limit purposes. Relatedly, SC Bank's standard commercial loan memorandum specifically identified other outstanding debt for a potential loan customer.

### The Nominee or Straw Lending Scheme

The practice of nominee or straw lending is one in which a bank makes loans to a nominal or straw borrower for the benefit of a concealed third party not included in the loan agreements. <u>United States v. Willis</u>, 997 F.2d 407, 410, N.2 (8th Cir, 1993). Nominee or straw loans are not necessarily illegal unless they are used to "deceive a financial institution about the true identity of a borrower." <u>United States v. Waldroop</u>, 431 F.3d 736, 741 (10th Cir, 2005). (Defendant convicted of bank fraud for nominee loan scheme avoiding lending limits).

Nominee loans are illegal where "… the borrower and the bank officer fail to state the real borrower and recipient of the funds, thereby obtaining the loans by means of a false pretense." <u>Willis</u>, 997 F.2d at 410, N.2. Nor are Nominee loans legal where the true nature of the nominee loan is concealed from the bank board of directors and regulatory authorities. <u>United States v. Wolf</u>, 820 F.2d 1499, 1503 (9th Cir. 1987) (director of bank found guilty of misapplication of bank funds pursuant to 18 U.S.C. § 656 and false entries on bank records in violation of 18 U.S.C. § 1005 where nominee loans were arranged to deceive bank officials and bank examiners and resulted in the entry of false information into the records of the bank.)

A scheme that uses nominee borrowers to obtain bank loans for a person who does not qualify for a loan constitutes a misapplication of bank funds in violation of Title 18 U.S.C. Section 656. United States v. Luke, 701 F.2d 1104, 1107 (4th Cir. 1983); see also, United States v. Cyr, 712 F.2d 729, 734 (1st Cir. 1983). Such a sham or nominee loan has a "natural tendency to injure or defraud the bank." United States v. Luke, 701 F.2d at 1108. Further, a nominee lending scheme may conceal that a bank officer is extending loans beyond the legal lending limits set by state or federal regulators to protect the bank. United States v. Markert, 732 F.3d 922, 931 (8th Cir. 2013), See also United States v. Vinson, 852 F.3d 333, 354 (4th Cir. 2017) (Bank president misapplied bank funds by failing to disclose material fact to loan committee that loans were being made to straw borrowers for the purpose of avoiding banks borrower limit). Nominee loans may increase the risk to a bank by creating a situation where the collateral apparently securing the loan belongs to the actual borrower and not the nominee who is legally obliged to the bank. United States v.Waldroop, 431 F.3d at 741-742. Finally, the entry of nominee transactions in the records of a bank can constitute a false entry in violation of Title 18 U.S.C. § 1005. United States v. Luke, 701 F.2d at 1108-1109.

In this matter, the defendants — together with BGH and Corriher — conspired to factor the purported receivables of five (later six) nominee entities for the purpose of extending credit to BGH's staffing business in contravention

8

of the lending limits. In reality, these entities — with the exception of IHT of SC had no staffing employees and performed no staffing business. The underlying staffing clients/account debtors received invoices from CMI, thought they were dealing with CMI, and wrote checks to CMI. Under the factoring agreements, they sent those checks directly to SC Bank. However, no written factoring agreement existed between SC Bank and CMI, which would have entitled the bank to factor the company's invoices and to receive payment from the account debtors.

Earnest supplied the paperwork – in particular, the commercial loan memos referenced above – used to misrepresent that BGH's company was actually several independently owned staffing businesses operating under a licensing agreement. In July of 2008, Earnest approved a $2 million factoring line of credit for each nominee entity. The factoring agreements provided that SC Bank would advance 85 percent of the value of each invoice until the invoice was paid, whereupon the remaining 15 percent would be paid to the company after allowing for interest and fees.

In January 2009, BGH moved the factoring business to SC Bank, thereby activating the five lines of credit set up the previous July. Of course, the nominee companies had neither staffing customers nor employees. In essence, they existed nowhere but in the books and records of SC Bank.

Corriher and Drake established an elaborate system at the bank by which thousands of payments made out to CMI were applied to the loan accounts in the names of the five nominees. They also set up a system whereby the proceeds of the loans made to the nominees were combined to fund wire transfers to an account controlled by BGH. Tellingly, some of these wire transfers were recorded at the bank as "for [BGH]."

The Payroll Tax Fraud

Like most staffing companies, CMI was contractually responsible for paying the payroll taxes for the thousands of low-wage temporary workers it supplied to clients for a fee. For this reason, CMI invoices included sufficient markup to cover the payroll taxes due the IRS. As the defendant employees of SC Bank understood, one of the biggest risks of extending credit to a staffing company — like CMI — is that the company will default on its payroll tax obligations. In that case, the IRS can assume a first lien position on the company's receivables, effectively displacing the bank as "first in line" creditor. Consequently, lenders such as SC Bank generally perform regular tax lien searches and/or request Forms 941 to monitor payroll tax compliance.

When Earnest and Corriher were alerted by an auditor in September 2009 that BGH was not providing the necessary information regarding the payment of payroll taxes – and in fact, the audit could not be completed for

that reason – they continued to wire advances per the nominee lending scheme through September 2010.

The Forms 941 issued and filed by CMI during the nominee lending scheme show that the funds were withheld from the wages of the workers. A substantial portion of the amounts billed by CMI to the underlying clients should have been used to make payroll tax deposits; however none of these deposits were ever made. Further, CMI employees had made Corriher aware of this by sending him Forms 941 that showed the lack of payroll tax deposits.

Essentially, the unpaid payroll taxes operated as a "slush fund" that served to pay for BGH's extravagant lifestyle and to retire the nonperforming or aging debt of the nominee entities on SC Bank's books. Earnest, Corriher, and BGH arranged to direct the bank's factoring advances — which properly belonged to CMI — in such a way that BGH could misappropriate the payroll taxes. This arrangement also enabled the defendants to deposit and retain money from CMI's clients, including those portions intended for payroll taxes, in spite of the fact that the bank had no written factoring agreement with CMI, the true owner of the factored invoices.

An analysis of records obtained from SC Bank reveals that the payroll tax "slush fund" served to recoup bad debt from credit extended to BGH[2] and

---

[2] In February of 2009, Corriher and Earnest began to realize that BGH had caused the bank to buy over $1 million in receivables that had already been

to pay the lucrative fees and high interest rates associated with factoring CMI's receivables. From 2009-2010, SC Bank received over one million dollars in interest alone from the nominee loans.

The IRS was defrauded of $7.5 million in CMI payroll taxes by Earnest, Corriher, and BGH in 2009 and 2010. Earnest persisted in funding the nominee lending scheme even though he knew none of the millions of dollars in payroll taxes was being paid over to the IRS.

Earnest testified before the tax grand jury on March 27 and August 27, 2013, and provided false and misleading testimony in both instances. He was adamant about the dangers to the bank of unpaid payroll taxes on the part of a factoring client, but denied any contemporaneous knowledge of such problems with the nominee entities. He also was adamant that it was an extremely important duty of any officer of the bank to bring to his attention any such hazards to creditworthiness. Earnest also testified that he knew BGH had been convicted of tax crimes and sent to prison and that he knew Corriher had testified at BGH's trial.

---

factored by a previous factoring lender or were otherwise uncollectable. Application of amounts paid on CMI invoices by its clients, including portions intended to pay payroll taxes were used to pay down the resultant bad debt covertly.

During Earnest's March 27, 2013 testimony, Earnest falsely claimed that he had little direct contact with BGH, despite the fact that he was BGH's personal loan officer and that BGH flew in to meet him at the bank on a regular basis. He also falsely claimed that he had not been aware that BGH had controlled the earlier iteration of his staffing companies and falsely claimed that the factoring debt from that earlier iteration was paid off in 2006.

During his August 27, 2013 grand jury appearance, Earnest falsely asserted that he had been unaware of the 2009 attempted audit which he himself had commissioned. Of course, through all of these appearances, Earnest made no effort to remove Corriher from SC Bank or even from his position in the factoring department.

III. <u>ELEMENTS OF CRIMES CHARGED</u>

    A. <u>Misapplication of Bank Funds, 18 U.S.C. § 656, Counts One (conspiracy), Fifteen through Twenty-Seven</u>

Title 18 United States Code § 656 prohibits misapplication of bank funds of a federally insured bank by its officers or employees. This section in pertinent part provides that:

> Whoever, being an officer, director, agent or employee of, or connected in any capacity with any Federal Reserve Bank, member bank, depository institution, holding company, national bank, insured bank, …willfully misapplies any of the moneys,

13

funds or credits of such bank…shall be fined not more than $1,000,000 or imprisoned not more than 30 years or both…[3]

The elements of Misapplication of Bank Funds by a bank officer or employee in violation of Title 18 United States Code are:

1. The bank is federally insured.
2. The defendant is a bank employee.
3. The defendant misapplied funds, monies and credits entrusted to the bank.
4. The defendant acted willfully and with intent to injure or defraud the bank.

United States v. Duncan, 598 F.2d 839, 858-859 (4th Cir. 1979).

To prove misapplication under §656, the United States must prove the conversion of bank funds to the use of the defendant or a third party. Id. Actual loss to the bank need not be proved, only that the bank was at least temporarily deprived of the possession, control or use of its funds. Id at 859. See Also, United States v. Markert, 732 F.3d 920, 927 (8th Cir. 2013). Probability of repayment of misapplied funds is not a defense. United States v. Cyr, 712 F.2d at 732. Further, the fact that the true borrower in a nominee lending scheme repaid the bank is not a defense to misapplication. United States v. Hoffman, 1996 WL 469901 at *3 (4th Cir. 1996) (Unpublished disposition).

While it is not part of the statutory language of §656, the United States is required to prove that the defendant acted with intent to defraud the bank.

---

[3] Misapplication of less than $1,000 is punishable with a fine and not more than one year of imprisonment. 18 U.S.C. § 656.

United States v. Duncan, 598 F.2d at 858. Reckless disregard by a bank official of his or her bank's interest is sufficient to meet the element of intent to defraud. United States v. Cyr, 712 F.2d at 732. The use of nominee borrowers to obtain bank funds for an unqualified borrower shows reckless disregard for the interests of the bank and satisfies the intent element of §656. Id. at 734. Further, the intent element of §656 is met by evidence that the bank officer or employee intended "to deceive bank officials, bank examiners, or the Federal Deposit Insurance Corporation." United States v. Wolf, 820 F.2d at 1503.

Violation of banking law or bank policy with the intent to deceive may indicate willful misapplication. United States v. Markert, 732 F.3d at 927-929. (Bank president used nominee lending scheme to loan borrower $2.2 million dollars over FDIC lending limit). The Court in Markert noted:

> As we have explained, knowing violation of rules designed to protect a bank's financial safety and stability, such as legal lending limits, when done with the intent to deceive the bank… falls squarely within the offense of willful misapplication of bank funds… Markert committed the Bank's loan reserves to nominee loans that Board of Directors and bank regulators would not have approved…

Id. at 929.

Nominee and straw borrower lending schemes in various forms have been held to be violations of §656. A scheme employing nominee borrowers to "obtain money from a bank for use by one who cannot herself arrange for a formal loan comes within the misapplication of bank funds prohibited by 18

15

U.S.C. §656." <u>United States v. Cyr</u>, 712 F.2d at 734. Nominee schemes to avoid

legal lending limits have also been found to be misapplications in violation of

§656.  <u>United States v. Markert</u>, 732 F.3d at 929.  Recently, the making of loans

to a straw buyer by a bank president to avoid a bank's internal "loans to one

borrower limit" without disclosing this fact to the bank's lending committee

has been held to be a violation of 18 U.S.C. § 656 by the Fourth Circuit Court

of Appeals.  <u>United States v. Vinson</u>, 852 F.3d at 354. A scheme using nominee

entities to borrow money to pass to a third party to repay an overdue bank debt

have been held to be misapplications of bank funds. <u>United States v. Luke</u>, 701

F.2d at 1106-1109.

     B. <u>Obtaining Money from Bank by False Pretense, 18 U.S.C. § 1344(2), Counts Two through Fourteen</u>

The elements of Title 18 U.S.C. §1344(2) are:

1.    That the defendant(s) executed a scheme and artifice to obtain money, funds, credits orother property owned by or under the control of the bank by means of material false and fraudulent pretenses representations or promises;
2.    That the defendant(s) did so with the intent to deceive and obtain money, funds and property owned by or under the control of the bank; and
3.    That the bank was then insured by the Federal Deposit Insurance Corporation.

<u>Loughrin v. United States</u>, 134 S.Ct. 2384, 2389 (2014).

Section 1344(1) requires that the defendant have intent to defraud a

financial institution.  <u>United States v. Adepoju</u>, 756 F.3d 250,255 (4th Cir.

2014).  However, Section 1344(2) requires only the intent of obtaining money or property of or in custody of a bank by false representations and does not require any specific intent to deceive a bank. Loughrin v. United States, 134 S.Ct. at 2389.  Intent to cause financial harm is not required by §1344(2). Shaw v. United States, 137 S.Ct. 462, 467-468 (2016).  Nor is the government required to show a financial loss. Id.

Nominee or straw lending schemes have been found to be violations of the bank fraud statute.  United States v. Waldroop, 431 F.3d 736, 741-742 (10th Cir. 2005). A borrower who receives funds from a nominee loan scheme and conceals that fact from the bank board of directors and federal regulators can be guilty of bank fraud. Id. See also, United States v. Bonnett, 877 F.2d 1450, 1458 (10th Cir. 1989)(Defendant liable under sections 1344(1) and 1344(2) for nominee lending scheme.) Evidence that a defendant obtained loans in the names of nominee, defunct or fake companies is sufficient to establish intent to defraud under either 1344(1) or 1344(2). United States v. Selgjekai, 678 Fed. Appx. 379, 384-385 (6th Cir. 2017).

In United States v.Vinson, the Fourth Circuit upheld the conviction at trial of a defendant for conspiracy to commit bank fraud under 1344(1) and obtaining money from several banks in violation of 1344(2).  Defendant Vinson conspired with several bank presidents to obtain money from the banks through a series of straw loans:

Vinson and his cohorts failed to disclose to the lenders material terms of lot loan transactions, including the following: that the loans were being obtained by straw borrowers for Vinson's benefit; that pursuant to side agreements between Vinson and the straw borrowers Vinson promised to repurchase the lots, to make straw borrower's payments for two years, to pay them monthly kickbacks, and to give them "seller concessions" covering their down payments; that the borrowers were simultaneously obtaining loans on additional lots from other banks; and that fraudulently inflated appraisals were being used. The evidence established that, if these terms were disclosed, the banks' respective loan committees … would not have approved the loans.

United States v. Vinson, 852 F.3d at 351.

C. False Entries on Records of Bank, 18 U.S.C. § 1005, Counts One (Conspiracy) and Twenty-Nine (Conspiracy)

Title 18 U.S.C. § 1005 provides in pertinent part that:

Whoever make being an officer, director, agent, or employee of any… insured bank…makes any false entry in any book, report, or statement of such bank… with intent to injure or defraud such bank … or to deceive any officer of such bank…, or the Federal Deposit Insurance Corporation, or any agent or examiner appointed to examine the affairs of such bank…

The elements of Title 18 U.S.C. § 1005 as it pertains in this case are:

1. That the defendant was an officer or employee of a bank that was then insured by the Federal Deposit Insurance Corporation;
2. That the defendant made an entry in the bank's records that was false;
3. That the defendant knew that entry was false at the time that she made it; and
4. The defendant had the intent to defraud the bank or to deceive an officer or director of the bank or the Federal Deposit Insurance Corporation or any agent or examiner appointed to examine the bank.

18 U.S.C. §1005, <u>United States v. Chaney</u>, 964 F.2d 437, 448-450, (5th Cir. 1992).

Congress passed 18 U.S.C. §1005 for the purpose of protecting the integrity of bank records. <u>United States v. Weidner</u>, 437 F.3d 1023, 1039-1040 (10th Cir. 2006). The United States is not required to prove intent to cause the bank injury, only that the defendant intended to defraud one or more of the bank's officers, auditors, examiners or agents. <u>United States v. Chaney</u>, 964 F.2d at 448-449.

D. <u>Obstruction of Justice, 18 U.S.C. § 1503, Count Thirty</u>

Earnest is charged alone in Count Thirty of the Superseding Indictment with obstruction of justice in regard to his Grand Jury testimony. The elements of Obstruction of Justice in violation of Title 18 U.S.C. § 1503 are:

1. The existence of a pending judicial proceeding;
2. That the defendant had knowledge of the pending proceeding; and
3. That the defendant acted corruptly with the intent to influence, obstruct or impede that proceeding in the due administration of justice.

<u>United States v. Edlind</u>, 887 F.3d 166, 176 (4th Cir. 2018)

The United States does not have to prove that the defendant successfully obstructed justice, only that his endeavor to do so had the natural and probable effect of interfering with the due administration of justice. <u>United States v. Aguilar</u>, 115 S.Ct 2357,2361 (1995), <u>See also</u>, <u>United States v. Edlind</u>, 887 F.3d at 176-177. The policy of Section 1503 is to prevent interference with the

19

evenhanded and orderly administration of justice. <u>United States v.</u> <u>Neiswender</u>, 590 F.2d 1269, 1273-1274 (4th Cir. 1979). Since evidence of intent is usually circumstantial, a defendant can be found culpable where the reasonable and foreseeable consequences of his acts are an obstruction of justice. <u>United States v. Edlind</u>, 887 F.3d at 176.

E. <u>Conspiracy, 18 U.S.C. § 371, Counts One and Twenty-Nine and</u> <u>"Klein" Conspiracy to Obstruct the I.R.S., 18 U.S.C. §371, Count</u> <u>Twenty-Eight</u>

Earnest, Drake and Taylor are charged with violating 18 U.S.C. § 371, which reads:

> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

The statute can be violated by agreeing either to defraud the United States or to commit a substantive offense against the United States. Drake, Earnest and Taylor are charged with conspiring to violate 18 U.S.C. §§ 656 and 1005 in Count one of the Superseding Indictment. It is alleged in Count Twenty-eight of the Superseding Indictment that Earnest conspired with Corriher, BGH, and others to defraud the United States. Finally, Drake, Earnest and Taylor are charged with conspiring to violate 18 U.S.C. § 1005 in Count Twenty-Nine.

20

According to the United States Supreme Court, "To conspire to defraud the United States means primarily to cheat the government out of property or money, but it also means to interfere with or obstruct one of its lawful government functions by deceit, craft, trickery, or at least by means that are dishonest." Hammerschmidt v. United States, 265 U.S. 182, 188 (1924). When the fraud involves the tax laws, the government alleges that the defendant acted for the purpose of "impeding, impairing, obstructing, or defeating the lawful government functions of the Internal Revenue Service of the Department of the Treasury in the ascertainment, computation, assessment, or collection of revenue: to wit, income taxes." United States v. Klein, 247 F.2d 908, 915 (2nd Cir. 1957).

In a so-called Klein conspiracy, the following elements must be proved beyond a reasonable doubt:

1. The existence of an agreement;
2. An overt act by one of the conspirators in furtherance of the agreement's objectives; and
3. An intent on the part of the conspirators to agree, as well as to defraud the United States.

United States v. Vogt, 910 F.2d 1184, 1202 (4th Cir. 1990).

According to the Fourth Circuit Court of Appeals, the government must prove that "an agreed upon objective of the conspiracy was to thwart the IRS's efforts to determine and collect income taxes." United States v. Hairston, 46

21

F.3d 361, 374 (4th Cir. 1995).  Further, a <u>Klein</u> conspiracy conviction will not stand "where impeding the IRS is only a collateral effect of the conspiracy."  <u>Id</u>.

"It is not necessary to prove a formal agreement to establish a conspiracy in violation of federal law; a tacit or mutual understanding among or between the parties will suffice.  <u>United States v. Depew</u>, 932 F.2d 324, 326 (4th Cir. 1991).  Whereas the government must prove that the defendant conspired with at least one other person (<u>see</u> <u>e.g.</u>, <u>United States v. Chase</u>, 372 F.2d 453, 459 (4th Cir. 1967)), it makes no difference whether the person is another defendant or even named in the indictment.  <u>Rogers v. United States</u>, 340 U.S. 367, 375 (1951); <u>see</u> <u>also</u> <u>United States v. Anderson</u>, 611 F.2d 504, 511 (4th Cir. 1979).

Once a conspiracy has been proven, the evidence "only need establish a slight connection between any given defendant and the conspiracy to support conviction."  <u>United States v. Strickland</u>, 245 F.3d 368, 385 (4th Cir. 2001). A defendant need not have knowledge of the details of the conspiracy (<u>United States v. Blumenthal</u>, 322 U.S. 539, 557 (1947)), and a defendant may be convicted despite having played a minor role in the overall conspiracy.  <u>United States v. Roberts</u>, 881 F.2d 95, 101 (4th Cir. 1999).

To sustain a conviction, "[T]here only needs to be a showing that the defendant knew of the conspiracy's purpose and some action indicating his participation."  <u>United States v. Collazo</u>, 732 F.2d 1200, 1205 (4th Cir. 1984).

The government is only required to prove one overt act in furtherance of the conspiracy, even if multiple overt acts are alleged in the indictment. <u>Anderson</u>, 611 F.2d at 510.

To prove a conspiracy to violate a substantive offense against the United States, the government must prove the following:

1. An unlawful agreement between two or more people to commit a crime;
2. That the defendant knowingly and willfully participated in the conspiracy; and
3. That an overt act was committed in furtherance of the conspiracy. <u>United States v. Vinson</u>, 852 F.3d 333 at 351 (Defendant convicted at trial of conspiracy with bank officers at two banks to misapply bank funds in "straw lending" scheme).

IV. <u>LEGAL AND EVIDENTIARY ISSUES</u>

A. <u>Willful Blindness</u>

Depending on the course of trial, the United States may request the Court instruct the jury on willful blindness. A jury may infer and rely on willful blindness where a defendant claims a lack of guilty knowledge but the evidence supports an inference of deliberate ignorance. <u>United States v. Zayyad</u>, 741 F.3d 452, 463 (4th Cir. 2014) (deliberate ignorance instruction allowed where evidence supported defendant's willful blindness to fact that drugs were counterfeit); <u>See also</u>, <u>United States v. Jinwright</u>, 683 F.3d 471, 480 (4th Cir. 2012) (Defendant willfully blind to tax liability). The two "basic requirements" for willful blindness are first, that there is a high probability

23

that the defendant knew that a fact existed and that, second, the defendant took deliberate actions to avoid learning of the fact. Id.; see also Global-Tech Appliances, Inc. v. SEB S.A., 131 S. Ct. 2060, 2070-2071 (2011). A willful blindness instruction is appropriate where the evidence shows that defendant deliberately shielded himself from "clear evidence of critical facts." United States v. Vinson, 854 F.3d at 357.

In this case, the United States anticipates that one or more of the defendants will claim at trial that they lacked any knowledge of criminal banking activity or tax fraud. However, the United States also anticipates that the evidence at trial will also show that such defendants may have made themselves deliberately ignorant of such wrongdoing. The evidence at trial will support an inference that the defendants "deliberately failed to ask questions that might have incriminated…" them. Id. (Willful Blindness instruction found to be appropriate where defendant chose not to ask questions which might reveal bank fraud and misapplication of bank funds).

B. Self-Serving Hearsay

According to multiple individuals interviewed as part of the investigation, Earnest, Drake, and Taylor made several statements in essence blaming others for the nominee lending scheme. Such statements constitute self-serving hearsay and are therefore inadmissible at trial if offered by the defendant.

24

Fed. R. Evid. 801(d)(2) excepts from the general hearsay prohibition a party-opponent's out-of-court statements offered *against* that person at trial. There is no such exception, however, for "self-serving, exculpatory statements made by a party which are being sought for admission by that same party." United States v. Wilkerson, 84 F.3d 692, 696 (4th Cir. 1996). With the foregoing in mind, the government shall object to any attempts by any defendant to elicit from witnesses that defendant's own self-serving statements.

C. Statements of Co-Conspirators

The United States anticipates that it will seek to introduce statements of co-conspirators at trial of this matter including statements of unindicted co-conspirator BGH. Rule 801(d)(2)(E) of the Federal Rules of Evidence provides that a statement is not hearsay if it is offered against an opposing party and "was made by the party's coconspirator during and in furtherance of the conspiracy." The party offering such statement must show (1) the existence of a conspiracy; (2) that the declarant and defendant were members of the conspiracy; and (3) that the statement was made in the course of and in furtherance of the conspiracy. United States v. Graham, 711 F.3d 445, 453 (4th Cir. 2013). A statement is made in the 'furtherance of the conspiracy" if it was intended to promote the objectives of the conspiracy. Id.

The existence of these elements must be shown by the proponent of the statement by the preponderance of the evidence. Bourjaily v. United States,

107 S.Ct. 2775, 2778 (1987). In determining whether the statement of a coconspirator is admissible under Rule 801(d)(2)(E), the trial court is not constrained by the formal rules of evidence and may consider the proffered statements of the coconspirator to determine whether any conspiracy existed. Id. at 2778-2783. The party offering the testimony need not show that the declarant was unavailable. United States v. Inadi, 106 S.Ct. 1121,1127-1129 (1986).

Statements made by coconspirators prior to the time that a particular defendant joined the conspiracy are admissible against that defendant. United States v. Jackson, 757 F.2d 1486, 1490 (1985).  Rule 801(d)(2)(E) applies equally to the statements of indicted and unindicted coconspirators. United States v. Lewis, 759 F.2d 1316, 1339 (8th Cir. 1985). There is no requirement that the person to whom the statement is made be a member of the conspiracy. United States v. Gupta, 747 F.3d 111, 125 (2nd Cir. 2014).  "Statements designed to induce the listener's assistance with respect to the conspiracy's goals satisfy the Rule's in-furtherance requirement." Id.

If a defendant objects to the admissibility of a statement offered under Rule 801(d)(2)(E), the court may conditionally admit the statement and rule on its final admission at the close of all the evidence. United States v. Correa-Osorio, 784 F.3d 11, 23-24 (1st Cir. 2015). The trial court is not required to make an explicit ruling that a conspiracy existed prior to conditional admission

26

of the statement. United States v. Jackson, 757 F.2d at 1490. If the United States fails to sufficiently meet its burden as to the statement's admissibility, the trial court may then exclude the evidence and provided the jury with a limiting instruction or declare a mistrial. Id.

    D. Evidence of Bank Regulation and Legal Lending Limits

The United States intends to present evidence of bank regulation and lending limits as evidence bearing on motive and intent and to allow the jury to understand the purpose of the nominee or straw lending scheme alleged in the Third Superseding Indictment. Evidence regarding civil bank regulation and lending limits is appropriate where such evidence goes to motive and intent. United States v. Wolf, 820 F.2d 1499, 1504-1505 (9th Cir. 1987). Further, evidence of civil bank regulation including evidence as to lending limits is appropriate where the jury could not understand the case without knowledge of lending limits. United States v. Stefan, 784 F.2d 1093, 1098 (11th Cir. 1986). The United States intends to request that the court provide the jury with an instruction admonishing the jury that a violation of civil banking regulations in itself does not amount to criminal conduct and that the United States in this case has the burden of proving all the elements of the crimes charged beyond a reasonable doubt. See United States v. Munoz-Franco, 487 F.3d 25, 65-66 (1st Cir. 2007) (Evidence of regulatory violations admissible and appropriate to help jury understand scheme and intent of

defendant where court instructed jury that violation of civil bank regulations was not a crime in itself and that evidence of such violations could be used by the jury in determining a defendant's motive or intent).

E. <u>Summary Witnesses and Summary Evidence</u>

Summary exhibits and testimony may be admitted as summaries of voluminous records, admissible pursuant to Fed. R. Evid. 1006 and/or presented as summaries helpful to the jury which may be admitted pursuant to Fed. R. Evid. 611(a). The government has filed notices of such evidence with regard to the testimony of FBI Forensic Accountant Donna Hench[4] (<u>See</u> Docs. # 265 and 304) and IRS Revenue Officer Teresa Driver (<u>See</u> Doc. # 415). The United States has also supplied the defense with additional information regarding the testimony of Ms. Hench by letter dated November 9, 2018 (Appendix A, hereto).

The United States also intends to introduce one additional summary exhibit prepared by Ms. Hench. A draft of that summary exhibit is Appendix B, hereto. The additional summary totals the earned interest that SC Bank derived from the factoring lines of credit to the five nominee companies and IHT of SC. Ms. Hench will testify that she arrived at the total by summing the amounts listed as "earned interest" in the header section of the "Paid Note

---

[4] Ms. Hench will testify at the end of the government's case-in-chief to summarize evidence. As previously explained (see Doc. #304 at 9), the government will request, pursuant to Federal Rule of Evidence 615(c), that she be permitted to be present at the trial in order to see and hear the evidence in the case.

28

Statements" for each of these entities. The "Paid Note Statements" —
government trial exhibits 210, 480, 538, 596, 650, and 712 — were previously
produced to the defendants in April 2018 and again on November 7, 2018.

Rule 1006 permits the admission of "charts into evidence as a surrogate
for underlying voluminous records" with the purpose to "reduce the volume of
written documents that are introduced into evidence by allowing in evidence
accurate derivatives from the voluminous documents." <u>United States v. Janati</u>,
374 F.3d 263, 272 (4th Cir. 2004). Accordingly, pursuant to Rule 1006, a
summary chart itself may be received into evidence so long as it is "an accurate
compilation of the voluminous records sought to be summarized" and the
underlying records are "otherwise . . . admissible in evidence." <u>Id</u>. Notably, the
underlying records themselves do not need to be admitted for a Rule 1006
summary chart to come into evidence. <u>See id.</u> at 272 73.

The proposed summaries by Ms. Hench and Ms. Driver are admissible
under Rule 1006 because they are "an accurate compilation of the voluminous
records sought to be summarized" and the underlying records are "otherwise .
. . admissible in evidence." <u>United States v. Janati</u>, 374 F.3d 263, 272 (4th Cir.
2004). In the alternative, the charts may be presented to the jury under
Federal Rule of Evidence 611(a). The Court has discretion to admit such
summary testimony and schedules pursuant to Fed R. Evid. 611(a), which
authorizes the court to "exercise reasonable control over the mode...of...

presenting evidence so as to (1) make the ... presentation effective for the ascertainment of the truth, [and] (2) avoid needless consumption of time." <u>See United States v. Gardner</u>, 611 F.2d 770, 776 (9th Cir. 1980).

F. <u>Rule 902(11) Certifications</u>

Pursuant to notices filed on the docket of this case (Docs. # 239, 244, 254, 283, 332) the United States intends to offer self-authenticating business records into evidence under Federal Rule of Evidence 902(11). Rule 902(11) provides in pertinent part for the self-authentication of "a domestic record of regularly conducted activity that would be admissible under Rule 803(6) if accompanied by a written declaration of its custodian or other qualified person . . . certifying that the record: (A) was made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters; (B) was kept in the course of the regularly conducted activity; and (C) was made by the regularly conducted activity as a regular practice."

Rule 902(11) provides for the self-authentication of properly certified business records admissible under the business records exception codified by Rule 803(6)). The Confrontation Clause ruling in the Supreme Court case of <u>Melendez Diaz v. Massachusetts</u>, 129 S.Ct. 2527, 2539 (2009) does not contradict Rule 902(11). There is ample authority that <u>Melendez-Diaz</u> does not apply to business records authenticated under Rule 902(11) because they

30

are not testimonial in nature and, therefore, do not implicate the Confrontation Clause. In Melendez Diaz itself, the Supreme Court drew a distinction between records created for business purposes and records created for purposes of trial. Quoting Crawford v. Washington, 541 U.S. 36, 56 (2004), the Melendez Diaz Court declared "[m]ost of the hearsay exceptions covered statements that by their nature were not testimonial — for example business records . . . ." 129 S. Ct. at 2539. The Court explained that "[b]usiness . . . records are generally admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because — having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial — they are not testimonial." Id. at 2540.

Accordingly, because the records at issue here are non-testimonial business records that have been properly authenticated under Rule 902(11) they are admissible without the testimony of a custodian. See United States v. Ali, 616 F.3d 745, 752 (8th Cir. 2010) (bank records that were self-authenticating under Rule 902(11) were properly admitted as business records under Federal Rule of Evidence 803(6) since "Melendez Diaz . . . does not apply to the HSBC business records that were kept in the ordinary course of business. These documents were nontestimonial and thus do not implicate the Confrontation Clause."); see also United States v. Yeley Davis, 632 F.3d 673

31

(10th Cir. 2011) (no Confrontation Clause violation occurred in admitting phone records because they qualified as nontestimonial business records under Fed. R. Evid. 803(6) and certificates of authenticity presented under Fed. R. Evid. 902(11) were not testimonial); see also United States v. Mallory, 709 F. Supp. 2d 451, 455 (E.D. Va 2010) (rejecting a Confrontation Clause challenge to Federal Express custodian Rule 902(11) certification and noting purpose of Rule 902(11) is to permit admission of records of regularly conducted business activity without requiring the testimony of a witness and observing "[t]o sustain Mr. Mallory's objection would amount to the absurd conclusion that the Supreme Court only ten years ago promulgated a rule that is unconstitutional in a significant percentage of its applications . . .")

It is well established that a business's records may contain information provided by third parties and be authenticated by the business entity alone. "[T]here is no requirement that the records be created by the business having custody of them." United States v. Wein, 521 F. App'x 138, 140 (4th Cir. 2013)(unpublished disposition) (quoting United States v. Duncan, 919 F.2d 981, 986 (5th Cir. 1990) (internal quotation marks omitted)); see also United States v. Childs, 5 F.3d 1328, 1333 (9th Cir. 1993) (observing that "[s]everal circuits have held that exhibits can be admitted as business records of an entity, even when that entity was not the maker of those records, so long as the other requirements of Rule 803(6) are met and the circumstances indicate

32

the records are trustworthy"). There is also no requirement that the custodian "confirm the accuracy of the record in order to be a qualified witness." <u>Wein</u>, 521 F. App'x at 140. Such an argument is, again, "directed to the weight of the evidence," and "does not affect the admissibility of the records." <u>Id.</u>

G. <u>Trial Presentation Software</u>

The government requests the Court's permission to use Sanction trial presentation software to present exhibits to the jury by means of the Court's audio-visual system.


This, the 27th day of December, 2018.

Respectfully submitted,

MATTHEW G.T. MARTIN
UNITED STATES ATTORNEY

/S/ FRANK J. CHUT, JR.
Assistant United States Attorney
North Carolina State Bar No. 17696
United States Attorney's Office
Middle District of North Carolina
101 S. Edgeworth Street, 4th Floor
Greensboro, North Carolina 27401
Phone: (336) 333-5351

## CERTIFICATE OF SERVICE

I hereby certify that on December 27, 2018, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification to counsel of record.

Respectfully submitted,

/S/ FRANK J. CHUT, JR.
Assistant United States Attorney
North Carolina State Bar No. 17696
United States Attorney's Office
Middle District of North Carolina
101 S. Edgeworth Street, 4th Floor
Greensboro, North Carolina 27401
Phone: (336) 333-5351